IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:23-CT-03277-M

| QUANTERIOUS HOMMIE WHATLEY, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | ORDER |
| CATHY JUDGE, *et al.*, | ) | |
| Defendants. | ) | |

This cause is before the court on defendants' motions to seal [D.E. 46] and for summary judgment [D.E. 42]. As discussed below, the court grants these motions.

Relevant Procedural History:

On August 9, 2023, Quanterious Hommie Whatley ("plaintiff"), a state inmate proceeding *pro se* and without prepayment of fees, filed in the U.S. District Court for the Western District of North Carolina an unverified civil rights complaint under 42 U.S.C. § 1983. [D.E. 1, 2, 8].

Plaintiff names as defendants in their official capacities Harnett C.I. Warden Cathy Judge and Captain Jimmy Dorman (collectively, "defendants"), and generally alleges violations of his Eighth Amendment rights from June 3, 2023, to August 7, 2023, when he was placed in restricted housing where the temperature was 118 degrees and there was "no water supply." See Compl. [D.E. 1] at 3–5. Plaintiff also alleges that the water was "cut off on purpose" and that, when he inquired why, he was told "it's not needed." Id. at 8. Plaintiff contends that he wrote both defendants regarding these issues but received no response. Id. at 5. As to his injuries, plaintiff asserts that he had "heat flashes [sic]" and trouble breathing, and that he passed out on July 21,

2023, and hit his head on the bars, "busting the top of [his] right eye," but he only received a bandage. Id. Plaintiff seeks monetary damages. Id.

On September 27, 2023, the action was transferred to this court. Order [D.E. 10].

On October 25, 2023, plaintiff moved for entry of default, Mot. [D.E. 13], and to amend the complaint to also include individual capacity claims against defendants, Mot. [D.E. 14].

On April 3, 2024, the court denied the premature motion for entry of default, granted the motion to amend, conducted initial review, and allowed the action to proceed. Order [D.E. 16].

On November 1, 2024, defendants answered the complaint. Answer [D.E. 28].

North Carolina Prisoner Legal Services, Inc., assisted plaintiff with discovery. [D.E. 39].

On July 3, 2025, defendants moved for summary judgment, Mot. [D.E. 42], and filed a memorandum in support [D.E. 43], a statement of facts [D.E. 44], an appendix [D.E. 45], a motion to seal proposed sealed documents, Mot. [D.E. 46], and proposed sealed documents [D.E. 47].

Pursuant to Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975) (per curiam), the court notified plaintiff about the motion for summary judgment, the response deadline, and the consequences of failing to respond. [D.E. 48].

On July 30, 2025, the court received plaintiff's response. [D.E. 49].

On August 13, 2025, defendants filed a reply. [D.E. 50].

Defendant's Motion to Seal:

The proposed sealed exhibit includes plaintiff's medical records [D.E. 47]. Plaintiff did not object and, after review under the governing standard, see Doe v. Public Citizen, 749 F.3d 246, 271–73 (4th Cir. 2014), the interest in preserving confidentiality in the medical records outweighs the public interest in disclosure. Thus, the court GRANTS the motion to seal [D.E. 46].

2

Defendant's Motion for Summary Judgment:

1) Statement of Facts:

The facts are somewhat disputed. Defendants' state, *inter alia*, that: at times relevant to the suit, plaintiff was incarcerated at Harnett C.I. where defendant Judge then was the Warden and defendant Dorman was one of four Correctional Captains; plaintiff was placed in the Restrictive Housing Unit ("RHU") due to an altercation and he later was found guilty of attempting a Class A disciplinary offense in connection with this altercation; "During the summer months, RHU officers conduct rounds through the unit every 30 minutes"; "If any repairs are needed within the RHU, maintenance is notified and tasked with carrying out the necessary repairs"; "Between June and August 2023, there were only two maintenance work orders related to water issues in the RHU," one involving low water pressure in a sink and the second related to a leaking water hose that formed puddles; both these water issues "were reported to maintenance for resolution" and both were resolved the same day the work order was submitted; "In the RHU, industrial-sized fans are used to cool the unit"; and, on July 20, 2023, "Plaintiff filed a prison grievance requesting an inspection of the fans' placement and functionality," "a work order was placed to confirm the fans were functional," and "Maintenance conducted a check that same day and noted that the fans were operational." See Defs.' Stmt. Mat. Facts. [D.E. 44] at 1–4.

Plaintiff states, *inter alia*, that: defendants admitted to knowing there was no air conditioning in the RHU from July to September 2023; "defendants denied having any knowledge of incident [sic]," but "Documents show signatures from Warden Cathy Judge, which shows defendants knew of the incident dealing with plaintiff [sic]"; Warden Judge denied knowledge of plaintiff's injuries in responses to his interrogatories # 12 and #14; Captain Dorman "denied any

3

knowledge of incident as well"; "medical records [state that Warden Judge] was notified on the day the incident occurred dated 8/27/23 at 1:50 p.m. which she also signed giving knowledge she knew of the incident [sic]"; when an emergency occurs, protocol requires that the officer in charge is notified and then notifies the Captain and Warden. See Pl.'s Resp. [D.E. 49] at 2.

The parties dispute whether plaintiff provided temperature readings in his pleadings. Compare Defs.' Stmt. Mat. Facts. [D.E. 44] at ¶12, with Pl.'s Resp. [D.E. 49] at 3.

Plaintiff queries, "If there was any clean drinking water[,] why would the officer on duty need to come every 30 minutes to pass out water in a jug [sic]." Pl.'s Resp. [D.E. 49] at 3. Plaintiff states that heat and lack of water led him to pass out, he placed numerous sick calls but did not receive medical care, and he placed a grievance about not receiving any medical care. Id.

Plaintiff also states he "wrote letters to both defendants addressing his concerns about the conditions of Restricted Housing Unit" but "defendants did not respond to [his] letters." Id. at 4.

As to water issues in the RHU, plaintiff states: officers did not come by every 30 minutes with a cooler of ice water as they sometimes did rounds hourly; he was never moved to another cell due to water pressure issues; and "there would be no record of water being dirty due to the fact the defendants would be held accountable for the violation" if there were a lawsuit. See id.

As to the fan issues in the RHU, plaintiff further states: fans were at both ends of the RHU hallway but, because of the distance, there was no way all the cells could feel the air; his middle-of-the-hallway cell could not feel any relief from the fans; and officers often would complain about the heat and would leave open to the outside the back door at the end of the hallway. See id.

As to medical records, plaintiff states he complained to medical about overheating in the RHU but was told that security officers were empowered to help, not medical staff. See id. at 5.

4

As to administrative remedies, plaintiff states he fully exhausted his available remedies because, had he written any health-related grievances, they would have been rejected. See id.

2) Legal Standard:

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment must initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A court reviewing a motion for summary judgment should determine if a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007).

3) Discussion:

First, although plaintiff raises official capacity claims against defendants, these claims are dismissed without prejudice as barred by the Eleventh Amendment because North Carolina has not waived immunity, see Will v. Michigan Dep't of State Police, 491 U.S. 58, 66, 71 (1989), and the prospective relief exception under the doctrine of Ex parte Young, 209 U.S. 123 (1908), does not apply, cf. Doe v. Univ. of N. Carolina Sys., 133 F.4th 305, 318 (4th Cir. 2025).

5

Turning to claims against defendants in their individual capacity, the court now considers defendants' argument that plaintiff failed to exhaust administrative remedies as to his claims before filing this action. The Prison Litigation Reform Act ("PLRA") states, in relevant part: "No action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); see Jones v. Bock, 549 U.S. 199, 211 (2007) ("[E]xhaustion is mandatory under the PLRA and . . . unexhausted claims cannot be brought in court."); Woodford v. Ngo, 548 U.S. 81, 85 (2006) ("Exhaustion is no longer left to the discretion of the district court, but is mandatory."); see also Porter v. Nussle, 534 U.S. 516, 532 (2002) ("[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.").

Successful exhaustion of administrative remedies "means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)." Woodford, 548 U.S. at 90 (citation, alteration, and internal quotation marks omitted); see Wilcox v. Brown, 877 F.3d 161, 167 n.4 (4th Cir. 2017) ("The main purpose of the PLRA's exhaustion requirement is 'allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record.'" (quoting Moore v. Bennette, 517 F.3d 717, 726 (4th Cir. 2008))).

PLRA administrative exhaustion, however, is mandatory only if the grievance procedure is "available." Ross v. Blake, 578 U.S. 632, 643–44 (2016) (finding grievance procedure "unavailable" when: 1) it "operates as a simple dead end—with officers unable or consistently

6

unwilling to provide any relief to aggrieved inmates"; 2) it is "so opaque that it becomes, practically speaking, incapable of use"; and 3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."); see Griffin v. Bryant, 56 F.4th 328, 335–39 (4th Cir. 2022); Moss v. Harwood, 19 F.4th 614, 621–23 (4th Cir. 2021); Moore, 517 F.3d at 725.

Failure to exhaust administrative remedies is an affirmative defense that defendants generally must plead and prove. See Jones, 549 U.S. at 216–17; Wilcox, 877 F.3d at 167; Custis v. Davis, 851 F.3d 358, 361–63 (4th Cir. 2017).

Here, Adrina Bass, the Executive Director of the Inmate Grievance Resolution Board ("IGRB") declares, *inter alia*, that: the North Carolina Department of Adult Correction ("DAC") has a three-step Administrative Remedy Procedure ("ARP") for offender grievances and appeals; administrative exhaustion is not complete until the IGRB completes Step-3 review of an appeal and issues an order; and, from January 1, 2023, until June 11, 2025, plaintiff fully exhausted two grievances. See Defs.' App., Bass Decl. [D.E. 45-10] at ¶¶1–11; see also DAC ARP, available at https://public.powerdms.com/NCDAC/tree/documents/2145373 (visited Sept. 30, 2025).

Contra defendants' arguments, the record shows plaintiff's relevant grievances, one of which he fully exhausted, sufficiently alerted the prison to the high temperatures and fan cooling issues in the RHU. See Wilcox, 877 F.3d at 167 n.4 ("To satisfy the exhaustion requirement, grievances generally need only be sufficient to 'alert[ ] the prison to the nature of the wrong for which redress is sought.'" (quotation omitted)); see also Defs.' App. [D.E. 45-7] at 3 (July 8, 2023, grievance stating: it is extremely hot in the RHU; he is sweating "like a pig," getting headaches, not eating, and he cannot really breathe and it's hard to sleep due to the extreme heat; and no one

7

can feel the air from the hallway fan); id. at 4 (July 12, 2023, Step-1 Unit Response to July 8, 2023, grievance noting a work order was placed to "look at the functionality of the fans and placement of them," and "Maintenance will also check the temperature when inspecting the operations of the fans," but, as to the request to be moved to a "livable unit," stating that the RHU unit is "perfectly functional," with plaintiff's check mark that he "agree[d] with grievance response"); [D.E. 6] at 2–3 (July 16, 2023, grievance alleging excessive heat and non-operational fans in the RHU that was rejected on that date as "already resolved"); id. at 4–8 (July 20, 2023, grievance stating, although it has been over eight business days, maintenance still has not come to check on operation or placement of fans, with an Aug. 1, 2023, Step-3 response fully exhausting this grievance).

By contrast, the record reflects that plaintiff's other claims – alleging lack of water supply in the RHU and that he received constitutionally inadequate medical care in relation to purportedly passing out and hitting his head on July 21, 2023 – are unexhausted. See Defs.' Reply Attach., Ex. 2 [D.E. 50-2] at 1–3 (Aug. 16, 2023, grievance asserting he filed multiple unanswered sick call requests, and that he is "a couple of weeks from passing out because of the heat and hitting [his] eye" – with plaintiff's check mark agreeing with Step-2 response on Aug. 30, 2023, thus not fully exhausting); see also Moore, 517 F.3d at 729 (finding prisoner's exhaustion of grievances as to inadequate medical treatment for Hepatitis C and pancreatic condition failed to exhaust claims alleging inadequate treatment for gout, a condition he did not mention in his exhausted grievances).

Considering the evidence and the reasonable inferences drawn therefrom in the light most favorable to plaintiff, Scott, 550 U.S. at 378, defendants have shown that plaintiff failed to exhaust administrative remedies before filing this action as to his water-related claims and claims of constitutionally inadequate medical care related to purportedly passing out and hitting his head on

July 21, 2023, Celotex, 477 U.S. at 325, see Jones, 549 U.S. at 216–17; Wilcox, 877 F.3d at 167, but plaintiff fails to come forward with specific facts showing the ARP was "unavailable," cf. Ross, 578 U.S. at 643–44; Griffin, 56 F.4th at 335; see Matsushita, 475 U.S. at 587. These unexhausted claims are dismissed without prejudice. Moss, 19 F.4th at 623 n.3 (collecting cases).

The court now considers plaintiff's exhausted claims regarding high temperatures and inadequate fan cooling in the RHU between June 3 and August 7, 2023. "In order to make out a *prima facie* case that prison conditions violate the Eighth Amendment, a plaintiff must show both (1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials." Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993) (quotation omitted). The first prong requires that "the deprivation of [a] basic human need was objectively sufficiently serious." Id. (quotation and emphasis omitted). The second prong requires a showing that "the officials acted with a sufficiently culpable state of mind." Id. (quotation and emphasis omitted); see Farmer v. Brennan, 511 U.S. 825, 835 (1994) ("[D]eliberate indifference entails something more than mere negligence [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.").

Deliberate indifference to a prisoner's serious medical needs also violates the Eighth Amendment. Estelle v. Gamble, 429 U.S. 97, 104 (1976). To support a claim that denial or delay of medical care amounted to deliberate indifference, a prisoner must show the official knew of and disregarded an objectively serious condition, known medical need, or substantial risk of serious harm. Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016) (noting a serious medical need is one "that has either 'been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"

9

(citation omitted)). Beyond such knowledge, the official "must also have recognized that his actions were insufficient to mitigate the risk of harm to the inmate." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (quotation marks and citation omitted).

To the extent plaintiff instead seeks to hold defendants liable for the actions of other officers, the doctrine of *respondeat superior* generally does not apply to a § 1983 action. See Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009); Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691– 92 (1978). Rather, for a cognizable supervisory liability claim, "[a] plaintiff must show actual or constructive knowledge of a risk of constitutional injury, deliberate indifference to that risk, and 'an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.'" Carter v. Morris, 164 F.3d 215, 221 (4th Cir. 1999) (quoting Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994)), abrogated on other grounds by Wilkins.

Warden Judge declares, *inter alia*, that: despite plaintiff's claims that the temperatures were extremely high in the RHU between June 3 and August 7, 2023, to Judge's recollection, the weather was normal for the summer months; RHU officers make rounds every 30 minutes; water is available for offenders during rounds, while they are in cells, at mealtime, and at recreation; medical staff make daily rounds in the RHU; if an issue requires a repair, a work order is submitted and a maintenance team is called to make repairs; Judge is not aware of any instance where maintenance did not make a repair; the Warden's duties do not include personally performing facility repairs; the RHU "is equipped with large fans that help keep the unit cool" and Judge does not recall that any fans were inoperable during these months; Judge has no knowledge of any inoperable fans or that plaintiff ever complained about RHU conditions during the relevant timeframe; Judge has no knowledge that plaintiff expressed concerns of any kind to the staff during

10

the relevant timeframe; at no time did Judge observe plaintiff experience any medical emergency during the relevant timeframe; at no time was Judge aware of a condition that would have cause plaintiff a medical emergency during the relevant timeframe; and, at no time were the conditions alleged by plaintiff reported to Judge. See Defs.' App., Judge Decl. [D.E. 45-8] at 1–3.

Captain Dorman declares, *inter alia*, that: Dorman was one of four shift captains, on duty 25% of the time; plaintiff "had ample opportunity" to report concerns to other captains and staff on duty; "If there had been any safety concerns or maintenance requests, they would have been promptly addressed"; the conditions about which plaintiff complains "were never observed or reported to" Dorman either during his own shift or by other staff assigned to work at other times; although plaintiff claims the temperatures were extremely high in the RHU between June 3 and August 7, 2023, "to [Dorman's] recollection the weather was normal"; every 30 minutes officers make rounds in the RHU; during the summer months, officers carry a cooler filled with ice water; offenders can request water from coolers when they need it either during these rounds or by getting the attention of a staff member to receive water on request; a cooler full of ice water is readily available during each meal and recreational period; "Offenders have access to ice water throughout the day, in addition to having water in their cells"; to Dorman's knowledge there was no cell without water during the timeframe of the complaint and, "if a cell happens to not have water, the offender in that cell is promptly moved to another cell equipped with running water, while the previous cell is repaired"; if there is an issue requiring repair, the maintenance team is called; Dorman is not aware of any instance where maintenance did not make a repair; it is not within Dorman's duties to perform repairs himself; during the relevant timeframe, "each hallway in [the RHU] was equipped with multiple large fans mounted on the walls that helped to keep air

11

circulating throughout the building, and cells, keeping the [RHU] as cool as possible"; during the relevant timeframe, Dorman had no knowledge that plaintiff "ever complained about the temperature" in the RHU, "that there was an inoperable fan," or that plaintiff "expressed concerns of any kind to staff"; during the relevant timeframe, Dorman did not observe plaintiff "experience any medical emergency"; "At no time was [Dorman] aware of a condition that would have caused any offender a medical emergency" during the relevant timeframe; RHU offenders have daily access to medical staff as they made rounds at least once a day; and Dorman has no knowledge of any instance where plaintiff was denied access to medical while in the RHU during the relevant timeframe. See id., Dorman Decl. [D.E. 45-9] at 1–4.

Both defendants declare that: plaintiff was just another inmate to them; they did not then, and do not now, have any feeling of ill will toward plaintiff; and they did not then, and do not now, wish to harm plaintiff. See id. at ¶17; Judge Decl. [D.E. 45-8] at ¶18.

Plaintiff declares, *inter alia*, that: at Harnett C.I. between June 3 and August 7, 2023, "the temperature [was] extremely high which mean[s] if it is 100 degrees outside then it is at least 10 degrees higher on the inside of restrictive housing [sic]"; the RHU has fans "but they were small and old but could not be felt down the hall into most of the cells[,] mainly cell #20 which [plaintiff] was assigned [sic]"; both defendants "were sent letters from [plaintiff] which was [sic] about the conditions of the RHU"; and "defendants both are very good people. I have nothing against them whatsoever. This lawsuit is not personal." See Pl.'s Decl. [D.E. 49-1] at ¶¶2, 4–7.

Although plaintiff alleges that, due to excessive heat and trouble breathing, he passed out on July 21, 2023, hit his head on the bars, "busting the top of [his] right eye," but only received a bandage, Compl. [D.E. 1] at 5, the available roughly contemporaneous records show no medical

12

complaints within the relevant timeframe, see Defs.' Ex. E [D.E. 47] at 1–2 (June 28, 2023, restrictive housing evaluation observing, "No prominent physical or psychomotor abnormalities are noted"); id. at 3–4 (July 26, 2023, restrictive housing evaluation observing: "No prominent physical or psychomotor abnormalities are noted," that plaintiff "describes his mood as 'good,' his energy level as 'good,' his appetite as 'good,' and his sleep as 'pretty good'"; "On a scale of 1 to 10, with 10 being perfect, he rates how he is doing overall at an '8'"; and plaintiff "reports going to recreation when it is offered to him"). Plaintiff's filings also acknowledge there are no records showing he fainted and was injured on July 21, 2023. See Pl.'s Resp. Attach. [D.E. 49-2] at 4.

Although the record reflects that Warden Judge signed off on plaintiff being transported for outside medical treatment at 1:50 p.m. on August 27, 2023, see id. [D.E. 49-2] at 6, this medical issue apparently arose when plaintiff passed out in his cell and hit his head circa 1:05 p.m. on that same date, see id. at 6, 8–12, and thus occurred *after* plaintiff filed this action on August 9, 2023. Plaintiff, however, may not amend his complaint to include this new claim through argument in opposition to defendants' motion for summary judgment. See Barclay White Skanska, Inc. v. Battelle Mem'l Inst., 262 F. App'x 556, 563 (4th Cir. 2008) (unpublished).

Although plaintiff declares that the temperatures were extremely high between June 3 and August 7, 2023, see Pl.'s Decl. [D.E. 49-1] at ¶4, and states, "he did indeed provide evidence of the thermostat readings [sic]," Pl.'s Resp. [D.E. 49] at 3, the only apparent temperature listings in the record are the undated 118 degrees alleged in his unverified complaint, Compl. [D.E. 1] at 5, and his apparently self-recorded "temperature record" from August 17 to 27, 2023, see [D.E. 9-1] at 2. Thus, despite receiving adequate notice under Roseboro and having an opportunity to do so, see Celotex, 477 U.S. at 324; cf. Pledger v. Lynch, 5 F.4th 511, 525–27 (4th Cir. 2021), plaintiff

13

failed to adduce competent evidence of specific temperature readings for the relevant dates alleged in the complaint in response to defendants' instant motion for summary judgment, see Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003) ("neither '[u]nsupported speculation,' nor evidence that is 'merely colorable' or 'not significantly probative,' will suffice to defeat a motion for summary judgment" (internal citations omitted)).

The record also reflects that a contemporaneous fan maintenance request was acted upon. See Defs.' App. [D.E. 45-11] at 2 (Maintenance Work Order for the Segregation Unit noting: July 20, 2023, as the request date, approval date, and completion date; as problem description, "check fan operation and check equal placement of fans in unit"; and, as comments, "all fans working").

Here, plaintiff fails to satisfy the objective prong of an Eighth Amendment claim because, within the relevant timeframe, there is no showing that his alleged issues with severe heat and lack of fan cooling in the RHU, and his related medical needs, were objectively sufficiently serious. See Iko, 535 F.3d at 241; Strickler, 989 F.2d at 1381 ("If a prisoner has not suffered serious or significant physical or mental injury as a result of the challenged condition, he simply has not been subjected to cruel and unusual punishment within the meaning of the Amendment."); see also Formica v. Aylor, 739 F. App'x 745, 755 (4th Cir. 2018) (per curiam) (unpublished) (noting, there is no Eighth Amendment violation for claims predicated on delay in medical care unless "the delay results in some substantial harm to the patient," such as a "marked" exacerbation of the prisoner's medical condition or "frequent complaints of severe pain."); Morton v. Sheeley, No. 3:12-CV-122, 2014 WL 3700011, at *22 (N.D.W. Va. July 24, 2014) (noting, although "[a]llowing a prisoner to be exposed to extreme temperatures can constitute a violation of the Eighth Amendment . . . there is no constitutional right to air conditioning." (citations and internal quotation marks omitted)).

14

Alternatively, presuming plaintiff could satisfy the Eighth Amendment's objective prong, he still fails to satisfy the subjective prong of his claims. See Farmer, 511 U.S. at 837 (finding no liability "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference"); Scinto, 841 F.3d at 225.

Defendants are not medical providers, and the record does not suggest that medical experts noted plaintiff's difficulties with high heat or recommended a different course of action within the relevant timeframe. Iko, 535 F.3d at 242 ("If a prisoner is under the care of medical experts . . . a nonmedical prison official will generally be justified in believing that the prisoner is in capable hands." (quotation omitted)); see also Lewis v. Hoke Cnty., No. 1:17CV987, 2020 WL 5213929, at *7 (M.D.N.C. Sept. 1, 2020) ("[P]rison officials without medical training are responsible for seeing that prisoners are attended to by medical professionals. They are not responsible for determining the course of treatment or for overruling the opinions of those professionals." (citation omitted)), report and recommendation adopted, No. 1:17CV987, 2022 WL 292928 (M.D.N.C. Feb. 1, 2022), aff'd, No. 22-6171, 2022 WL 1641282 (4th Cir. May 24, 2022).

Although plaintiff declares that he wrote letters to defendants about RHU conditions that went unanswered, see Pl.'s Decl. [D.E. 49-1] at ¶6, no such letters are within the record. As noted above, defendants declare that, during the relevant timeframe: they had no knowledge of plaintiff's complaints about RHU conditions and did not observe the conditions he alleges; temperatures seemed normal for that time of year; they had no knowledge of inoperable fans or inadequate repairs; water was available to RHU inmates; they did not observe plaintiff experience any medical emergency or be denied medical care; and they were not aware of conditions that would cause

15

offender medical emergencies. See Defs.' App., Judge Decl. [D.E. 45-8] at ¶¶4–17; id. Dorman Decl. [D.E. 45-9] at ¶¶6–16. As also noted above, defendants both also declare, and plaintiff does not contest, that: plaintiff was just another inmate to them; they did not then, and do not now, have any feeling of ill will toward him; and they did not then, and do not now, wish to harm him. Id., Judge Decl. [D.E. 45-8] at ¶18; id., Dorman Decl. [D.E. 45-9] at ¶17.

Succinctly stated, the record evidence showing that the RHU fans were operational circa July 20, 2023, as well as defendants' declarations that cool water was available to inmates and medical staff made daily rounds in the RHU, support an inference that defendants behaved reasonably in response to the risk due to excessive heat. See Farmer, 511 U.S. at 844 (finding an official "who actually [knows] of a substantial risk to inmate health or safety may be found free from liability if he responded reasonably to the risk, even if the harm ultimately was not averted.").

Thus, within the relevant timeframe, plaintiff has not shown, and the record does not reflect, that defendants knew of but disregarded a substantial risk of serious harm to plaintiff, see Farmer, 511 U.S. at 837, recognized that their actions were insufficient to mitigate this risk of harm, see Iko, 535 F.3d at 241, or acted with the requisite culpable state of mind, see King v. Riley, 76 F.4th 259, 269 (4th Cir. 2023) ("At summary judgment, a plaintiff must identify evidence that each individual defendant acted (or failed to act) with a culpable state of mind." (citation omitted)).

Instead, plaintiff has shown defendants were, at most, merely negligent as to the alleged excessive heat, ineffective fan cooling, and his related medical needs, the danger of which they "should have perceived but did not." Farmer, 511 U.S. at 838; Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999) ("Deliberate indifference is a very high standard–a showing of mere negligence will not meet it."); see Anderson, 477 U.S. at 252 (noting the "mere existence of a scintilla of

16

evidence" favoring the non-moving party will not prevent summary judgment); Whitley v. Albers, 475 U.S. 312, 319 (1986) (noting it is "obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause."), abrogated on other grounds by Wilkins v. Gaddy, 559 U.S. 34 (2010) (per curiam).

As to supervisory liability claims during the relevant timeframe, plaintiff fails to show, and the record does not support an inference, that defendants' subordinates engaged in conduct that posed a "pervasive and unreasonable risk" of harm to inmates like plaintiff, that such conduct was "widespread, or at least has been used on several different occasions," and that defendants failed to act "in the face of documented widespread abuses." Cf. Shaw, 13 F.3d at 799; see Wai Man Tom v. Hosp. Ventures LLC, 980 F.3d 1027, 1037 (4th Cir. 2020) (noting, "conclusory allegations or denials, without more, are insufficient to preclude granting [a] summary judgment motion").

Viewing the evidence and the reasonable inferences drawn therefrom in the light most favorable to plaintiff, Scott, 550 U.S. at 378, defendants have met their burden of showing the absence of evidence to support plaintiff's exhausted claims, Celotex, 477 U.S. at 325, but plaintiff fails to "come forward with specific facts showing that there is a genuine issue for trial," Matsushita, 475 U.S. at 587 (emphasis and quotation omitted). Accordingly, defendants are entitled to summary judgment. See Anderson, 477 U.S. at 249.

Alternatively, because they are government officials, defendants are entitled to qualified immunity from civil damages so long as their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently

17

clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (alterations and quotations omitted).

Here, because there is no showing that defendants violated plaintiff's clearly established rights, defendants also are entitled to qualified immunity. Id. at 743 ("When properly applied, [qualified immunity] protects 'all but the plainly incompetent or those who knowingly violate the law.'" (citation omitted)); see Farmer, 511 U.S. at 837 ("The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'"); Rhodes v. Chapman, 452 U.S. 337, 349 (1981) (noting, "the Constitution does not mandate comfortable prisons"); see also Ball v. LeBlanc, 792 F.3d 584, 592 (5th Cir. 2015) ("Without the requisite proof of both subjective and objective components of an Eighth Amendment violation, however, merely 'uncomfortable' heat in a prisoner's cell does not reflect 'a basic human need that the prison has failed to meet' and is not constitutionally suspect" (citation omitted)).

## Conclusion:

In sum, the court: GRANTS defendants' motion to seal [D.E. 46]; GRANTS defendants' motion for summary judgment [D.E. 42]; DISMISSES the complaint but WITHOUT PREJUDICE as to plaintiff's unexhausted claims, as discussed above; and DIRECTS the clerk to close the case.

SO ORDERED this 14th day of October, 2025.

RICHARD E. MYERS II
Chief United States District Judge

18

Case 5:23-ct-03277-M    Document 51    Filed 10/14/25    Page 18 of 18